UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | NO. 2:15-CR-00132-RLJ |
| vs. | ) | |
| LAMONT DARNELL FORTUNE, | ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court pursuant to 28 U.S.C. § 636 and standing orders of the District Court. Before the Court is Defendant Lamont Fortune's ("Fortune") motion to suppress [Doc. 119]. The Government has filed its response in opposition [Doc. 124], and the Court conducted an evidentiary hearing on the motion on March 10, 2017. The matter is now ripe for resolution.

**I.   PROCEDURAL BACKGROUND**

On November 10, 2015, the grand jury indicted Fortune with, among other things, a conspiracy to distribute 280 grams or more of crack cocaine. [Doc. 3, *Indictment*]. Fortune has filed a motion to suppress the crack cocaine seized from his person pursuant to a warrantless search conducted on June 8, 2012 [Doc. 119]. He alleges: (1) the traffic stop was unlawful, (2) the stop was impermissibly prolonged, and (3) he did not consent to be searched, or in the alternative, he revoked his consent prior to the officer's discovery of narcotics.

1

## II.     FINDINGS OF FACT

At the evidentiary hearing, the only witnesses to testify were Officer Thomas Garrison ("Garrison") and Officer Alex Perry ("Perry"). Based on the testimony from the hearing, the Court makes the following findings of fact.

On June 8, 2012, while on patrol in Johnson City, Washington County, Tennessee, Garrison spotted Jessie Pate ("Pate") driving a 2001 Mazda Protégé. Garrison knew Pate was a drug dealer as Garrison had been involved in controlled buys with Pate the previous year. Garrison began to follow Pate and radioed K9 Sergeant Eric Dougherty for backup support. Garrison maintained a distance of at least four to five car lengths behind Pate. Pate was proceeding down Stuart Avenue which ended at Fairview Avenue. Pate stopped at the stop sign and then proceeded to turn right onto Fairview Avenue. No other traffic was around. Pate did not activate his turn signal until the turn was nearly complete. Immediately thereafter, at 6:45 p.m., Garrison initiated a traffic stop on the grounds that Pate had failed to signal in violation of Tennessee Code Annotated § 55-8-143.

Garrison approached the car and noticed two passengers, Hayward Dargan ("Dargan") and Fortune, inside. He explained to Pate that he conducted the stop based on the turn signal violation and also questioned the status of his license. Garrison knew that Pate's license had previously been suspended. Garrison then asked Pate to step out of the car. Both passengers remained in the vehicle at this time. Pate walked with Garrison to his patrol car where they briefly spoke. Garrison then returned to Pate's vehicle to ask Dargan and Fortune for their identification. Garrison then returned to his patrol car to run the three names and vehicle information. At this time, Garrison asked Pate for permission to search the car. Pate declined.

2

At approximately 6:51 p.m., six minutes after the initial stop, Sgt. Dougherty arrived on the scene with his drug dog. At roughly 7:02 p.m., Perry arrived on the scene. After speaking with Garrison at his patrol car, Perry, along with another officer, approached the vehicle and asked Dargan and Fortune to step outside because Sgt. Dougherty was about to walk the drug dog around the vehicle. They complied and stepped out of the car. Neither Dargan nor Fortune asked to leave at any point. While Garrison was finalizing the traffic citation, Sgt. Dougherty walked the drug dog around the vehicle. The drug dog alerted at the driver's side door and the front passenger's door.

While that was occurring, Perry asked Fortune if he possessed anything illegal, such as a firearm, knife, or narcotics, on his body. Fortune replied he did not. Perry then asked Fortune for permission to search him. Fortune consented. Fortune then turned around so that his back was facing the officer and laced his fingers behind his head. Perry then began patting him down when he felt a large, round object, which he believed contained narcotics based on his training and experience. As soon as Perry touched the object, Fortune tensed his body and started moving his hands away from his head. Concerned for his own safety, Perry immediately attempted to stop Fortune's furtive movements. Another officer ran over to assist. Perry was concerned for his own safety and that of the other officers because he was unsure if Fortune was attempting to retrieve a firearm.

Once secured, Officer Perry removed the object in Fortune's pants, which was a large bag with nine smaller bags inside, each with a substance that appeared to be crack cocaine. Fortune never orally revoked consent or communicated at all after he consented to the search.

3

### III.     DISCUSSION

#### A.      Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity.'" *United States v. Rios*, 830 F.3d 403, 429 (6th Cir. 2016) (quoting *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012); *see United States v. Carter*, 662 F. App'x 342, 346 (6th Cir. 2016) ("'[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful.'") (quoting *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000)).[1]

Garrison did not have any suspicion that Pate was currently engaged in any ongoing criminal activity. He simply noticed him driving and decided to follow him given his prior experiences with Pate in trafficking narcotics. Thus, the question becomes whether he had reasonable suspicion that Pate had violated the law in the operation of his motor vehicle.

Garrison stopped Pate because he believed he failed to properly signal his turn from Stuart Avenue onto Fairview Avenue. Tenn. Code Ann. § 55-8-142(a) provides that "No person shall so turn any vehicle without giving an appropriate signal in the manner provided in §§ 55-8-143 … in the event any other traffic may be affected by this movement." Tenn. Code Ann. § 55-8-143(a) establishes that

---

[1] In *Heien v. North Carolina*, 135 S. Ct. 530, 536, 190 L. Ed. 2d 475 (U.S. 2014), the Supreme Court noted that "All parties agree that to justify [a traffic stop], officers need only "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law.

> [e]very driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and *whenever the operation of any other vehicle may be affected by such movement, shall give a signal required* in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.

*Id.* at § 55-8-143(a) (emphasis added).

This statute has been consistently interpreted by both state and federal courts for nearly two decades. In *State v. Gonzales*, 52 S.W.3d 90, 93 (Tenn. Ct. App. 2000), an officer stopped a vehicle on the grounds that the driver had failed to use his turn signal. The Court of Criminal Appeals noted that the driver was not in violation of this statute because "no other vehicles could have been affected by [the driver's] movement." *Id.* Accordingly, the Court found that the stop was not supported by probable cause. *Id.*; *see State v. Turk*, E2011-02472-CCA-R3-CD, 2012 WL 6042616, at *5 (Tenn. Ct. App. Dec. 5, 2012) (same); *State v. Schoenthal*, No. E2010-01312-CCA-R3-CD, 2011 WL 1599227, at *3 (Tenn. Ct. App. Apr. 27, 2011) (same).

In accordance with state court interpretations of this statute, federal courts in this district have consistently held that this statute requires that other traffic be in the vicinity "to be potentially affected." *United States v. Bias*, No. 3:08-cr-52, 2008 WL 4683217, at *3 (E.D. Tenn. Oct. 20, 2008). In *Bias*, the officer conceded he could not recall any other vehicles near the car in question when it failed to use a turn signal. *Id.* The Government highlighted, however, that the area commonly had high traffic during the time of the stop. *Id.* In response, the court noted that

> [a]t best the government has proven a mere possibility that other vehicles were present at the businesses surrounding the intersection. Whether they were parked or moving into the roadway is a matter of sheer conjecture and does not demonstrate that any vehicle could have been affected by the driver's failure to signal.

*Id.* at *4.  As such, the court found that the officer lacked both probable cause and reasonable suspicion to believe a traffic violation occurred.  *Id.* at *3.  This reasoning has been consistently applied in this district.  *See United States v. Cornielius*, No. 3:11-CR-62, 2011 WL 3949806, at *6 (E.D. Tenn. Jul. 26, 2011) ("The Court finds that [the officer] did not have an objective basis for suspecting the Defendant committed a traffic violation because the Defendant's failure to signal did not affect another vehicle and under the circumstances described could not have affected any other driver."); *see also United States v. Allen*, No. 1:10-CR-5, 2010 WL 5349199, at *6 (E.D. Tenn. June 29, 2010).

The Government argued that the stop occurred during a time of day that usually had high traffic patterns, insinuating that it was likely traffic was present during the stop.  However, this argument at best demonstrates a mere possibility that other vehicles could have been present.  That is not sufficient.  *See Bias*, 2008 WL 4683217, at *4.  As such, consistent with the state and federal courts' interpretation of this statute, Garrison did not have a reasonable suspicion or probable cause to believe a traffic violation occurred.

Relying on *Heien v. United States*, 135 S. Ct. 530 (2014), the Government contends that if the Court finds Garrison lacked a legal basis to make the stop, it was objectively reasonable for Garrison to believe that Pate violated the statue.  As such, although actual probable cause or reasonable suspicion may not have existed, the Government avers the stop was still lawful.

In *Heien*, the United States Supreme Court held that similar to reasonable mistakes of fact, officers are permitted to make reasonable mistakes of law without violating the Fourth Amendment.  135 S. Ct. at 536.  *Heien* involved North Carolina's brake light statue, which was the premise for the officer effecting a traffic stop that resulted in the discovery of cocaine.  *Id.* at 535.  The officer believed that the statute required both brake lights to be working, although

6

North Carolina state appellate courts clarified on direct appeal that only one working brake light was required. *Id.* This was an issue of first impression for the state courts.

The Supreme Court found the stop to be permissible because the officer's confusion regarding the law was objectively reasonable. *Id.* at 540. The Court, however, emphasized that "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved." *Id.* at 539 (emphasis in original). It cautioned that "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Id.* at 539-540.

Interpreting *Heien*, the Sixth Circuit has stressed that "[i]f it is appropriate to presume that citizens know the parameters of the criminal laws, it is surely appropriate to expect the same of law enforcement officers—at least with regard to unambiguous statutes." *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015). It also reasserted the Supreme Court's position that "[it] certainly [does] not wish to afford officers a 'Fourth Amendment advantage through a sloppy study of the laws.'" *Sinclair v. Lauderdale Cnty., Tenn.*, 652 Fed. App'x 429, 435 (6th Cir. 2016) (quoting *Heien*, 135 S. Ct. at 539).

In the instant matter, the statute at issue, Tenn. Code Ann. § 55-8-143, is not ambiguous unlike North Carolina's statute the Supreme Court addressed in *Heien.* Tennessee's turn signal statue does not involve any other provisions that add confusion as to what constitutes a violation. The statute clearly specifies any driver who intends to "start, stop or turn, or partly turn" shall "first see that such movement can be made safely, *and whenever the operation of any other vehicle may be affected by such movement, shall give a signal*." Tenn. Code Ann. § 55-8-143(a) (emphasis added). The only related provision is the preceding statute, which instructs that

7

subsection 55-8-143 governs when a driver must give an appropriate turn signal. *Id.* at § 55-8-142(a). The Tennessee statute also unambiguously contemplates that only other vehicles in operation are to be considered. *Id*. at § 55-8-143(a).

Unlike North Carolina's brake light statute in *Heien*, this Tennessee statute has been uniformly applied both in state and federal courts as noted. *See Gonzalez*, 52 S.W.3d at 93; *see also Bias*, 2008 WL 4683217, at \*3. To violate the statute requires that there be other traffic that may be affected. That is, if there is no traffic present when the turn is being made, then the statute does not impose a duty to use the turn signal. The Court finds that Garrison did not make a reasonable mistake of law by believing that parked cars and the possibility of unseen traffic permitted him to effect a stop under Tennessee's turn signal statute.

Garrison did not have a reasonable suspicion that Pate had violated the traffic laws. Thus, the stop was unlawful. As a passenger, Fortune had the right to challenge the stop. *Bredlin v. California,* 551 U.S. 249 (2007)("We hold that a passenger is seized [as is the driver] and so may challenge the constitutionality of the stop").

The next issue, while not raised by the parties, is whether Fortune's consent constitutes an intervening event that would otherwise render the discovery of the crack cocaine admissible. In *United States v. Beauchamp*, 659 F.3d 560, 573 (6th Cir. 2011), the Sixth Circuit noted that where a defendant has voluntarily consented after an illegal seizure, "the consent is tainted by the illegality and does not justify the search." *Id.* The Sixth Circuit noted that it has "repeatedly followed this precedent, holding that 'evidence obtained pursuant to the consent to search must be suppressed' if the consent was given after an illegal seizure." *Id.* (quoting *United States v. Lopez–Arias*, 344 F.3d 623, 629 (6th Cir.2003)). It noted that for the seized evidence to be admissible, "not only must the consent be valid, i.e., voluntary ... but the causal chain between

8

Case 2:15-cr-00132-RLJ-MCLC   Document 131   Filed 03/24/17   Page 8 of 14
PageID #: 755

the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule." *Id.*

In *Beauchamp,* the Court identified a number of factors for the courts to consider in making that decision: "the length of time between the illegal seizure and the consent; the presence of intervening circumstances; the purpose and flagrancy of the official misconduct; and whether the officers read the suspect his *Miranda* rights before he consented." *Id.* at 573. The length of time between the stop and the consent was minimal. That factor favors suppression. There was no evidence presented of any intervening circumstances. Rather, it was only minutes after the stop that the Defendant along with the other passenger in the vehicle were asked to step out of the vehicle. There was no official misconduct in this case. The officers conducted themselves professionally and the Court credits their testimony. Finally, officers did not read Defendant his *Miranda* rights before he consented.

The Court finds that none of these factors dissipates the taint from the illegal traffic stop. Therefore, the narcotics discovered subsequent to the unconstitutional stop must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). "[A]ny evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

Accordingly, the Court respectfully RECOMMENDS that Defendant's motion to suppress [Doc. 119] be GRANTED, and that the District Court suppress the narcotics discovered on Fortune's person. In the event that the District Court may determine the stop to be lawful, this Court shall proceed to consider Defendant's alternative two bases for suppression, that is, his arguments that the traffic stop was unreasonably prolonged and his consent to search was not voluntary.

### B. Duration of Traffic Stop

In addition to arguing that the traffic stop was unlawful, Defendant asserts that the stop was impermissibly prolonged. It is well established that "[a] seizure for a traffic violation justified a police investigation of that violation. . . . Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determination by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). As the stop's purpose is to address the infraction, "it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 420 (2005)). However, no bright line rule exists to what constitutes an unreasonable amount of time to conduct a traffic stop. *See United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (finding a twenty-one minute stop to be reasonable for a traffic stop); *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (finding a twenty-two minute stop to be reasonable). Notably, a traffic stop seizes not only the driver but any passengers as well. *See Johnson*, 555 U.S. at 332 ("a passenger is seized, just as the driver is") (internal citations omitted).

The Sixth Circuit has explained that "'an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop.'" *United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009) (quoting *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir. 1999); *see Rodriguez*, 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such

10

inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). "[A]n officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there is no reasonable suspicion of any wrongdoing by the passengers." *United States v. Alexander*, 467 Fed. App'x 355, 362 (6th Cir. 2012); *see United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) ("Nor was it inappropriate for [the officer] to check both whether [the driver] and [the passenger] had valid identification and whether they had any outstanding warrants").

It is well-established that given the interest in officer safety, "'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). The *Mimms* rule also applies to passengers as the safety concerns for the officers "'is present regardless of whether the occupant of the stopped car is a driver or a passenger.'" *Id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 413 (1997). Further, certain unrelated investigations, such as drug dog sniff tests, are permissible under the Fourth Amendment when they do not lengthen the roadside detention. *Id.*; *see Caballes*, 543 U.S. at 420. Officers also may inquire about matters unrelated to the justification of the traffic stop without converting the encounter into something other than a lawful seizure. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

In the instant matter, the traffic stop lasted approximately twenty minutes before Fortune granted consent for Perry to search him. Garrison testified that the typical time for a traffic stop is ten to fifteen minutes, but that stops often last longer depending on a number of circumstances,

11

including: the number of passengers, the time required to run checks on each of the passengers, and any delays in receiving information on tags and vehicles from dispatch. He noted that checks on vehicles and individuals are often a mixture of checks the officer himself runs and ones run by dispatch. The information is generally not immediately received.

When the stop was initially effected, Garrison informed Pate why he was pulled over and inquired into the status of his license. He then requested Pate step out of the car. Notably, Garrison knew Pate to be a drug trafficker. He walked Pate back to his patrol vehicle, and they spoke. Shortly thereafter, Garrison returned to the car to request the two passengers' identification. Upon receipt, he returned to his car in order to initiate checks on all three individuals for outstanding warrants and on the vehicle. Six minutes after the stop began, the K9 Unit arrived while Garrison was in the midst of running the information. Officers Gryder and Perry both arrived subsequently, with Perry being the last to arrive roughly seventeen minutes after the stop started. Once they arrived, they asked Dargan and Fortune to step out of vehicle in order for Sgt. Dougherty to perform a canine sniff test. The sniff test was conducted as Garrison was filling out a traffic citation for Pate. The drug dog alerted twice on the car. Perry asked Fortune if he possessed anything illegal, such as a firearm, knife, or narcotics, on his body. Fortune replied he did not. Perry then requested permission to search Fortune. He consented to a search, which ultimately revealed crack cocaine.

The evidence presented does not support Defendant's argument that the stop was unlawfully prolonged or took an unreasonable amount of time to be completed. *See Collazo*, 818 F.3d at 257 (finding a twenty-one minute stop to be reasonable for a traffic stop). Garrison appeared to focus his questioning of Pate to issues related to the traffic stop. The only interaction Garrison had with Dargan and Fortune was to ask for their identifications in order to

conduct typical traffic stop inquiries such as checking for warrants. *See Rodriguez*, 135 S. Ct. at 1615. As the Fourth Amendment permits officers to check the identification of passengers, Garrison was within the boundaries of the law to perform such checks. *See Alexander*, 467 F. App'x at 362. Sgt. Dougherty arrived with his canine only six minutes into the stop. Given the amount of information Garrison was checking, the Court finds it reasonable that it took approximately twenty minutes to collect the necessary results before starting to write the traffic citation. As the canine sniff test was conducted while Garrison was preparing the citation, it clearly did not prolong the traffic stop. *See Johnson*, 555 U.S. at 331. Accordingly, under the circumstances, the Court finds the stop was conducted in a reasonable amount of time.

### C. Consent to Search

Defendant finally asserts that he did not give consent to be searched. If the Court finds that he did give consent, he argues in the alternative that he effectively revoked consent during the search. The Government asserts that Defendant freely and voluntarily gave Perry consent to search him, and that his actions during the search did not constitute a revocation.

Perry testified that Fortune verbally gave him consent to be searched, and at no point did Fortune revoke this consent. The Court finds Perry to be credible, and Defendant presented no evidence to undermine his testimony. Further, Defendant did not testify or present any witnesses to provide a contrary set of facts. To conduct the search, Perry had Fortune turn around so that his back was facing the officer and lace his fingers behind his head. During the search, Perry felt a large, round object on the back of Fortune's pants he believed contained narcotics. As soon as he touched the object, Fortune tensed his body, tried to unlace his fingers, and began resisting the search but said nothing. Perry immediately secured Fortune with the assistance of Officer

13

Case 2:15-cr-00132-RLJ-MCLC Document 131 Filed 03/24/17 Page 13 of 14
PageID #: 760

Gryder, placing Fortune under arrest. He then retrieved the object from Fortune's pants, which contained crack cocaine.

Based on the evidence presented, Fortune voluntarily consented to the search, and during the search, Officer Perry discovered what he believed to be narcotics, which was confirmed after Fortune was placed in handcuffs. Accordingly, the Court finds that this argument is without merit.

## IV. CONCLUSION

Based on the foregoing reasons, the Court respectfully RECOMMENDS that Defendant's motion to suppress be GRANTED.[2]

Respectfully Submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).